E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
LAURA A. ALEXANDER (Cal. Bar No. 313212)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1019
    Facsimile: (213) 894-0141
    E-mail:    laura.alexander@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>BRIAN MICHAEL GAHERTY,<br><br>       Defendant. | No. CR 23-184-RGK<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT BRIAN MICHAEL GAHERTY'S SENTENCING POSITION AND OBJECTIONS TO THE PRETRIAL SENTENCE REPORT<br><br>Hearing Date: June 17, 2024<br>Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the Hon. R. Gary Klausner |
|---|---|

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Laura A. Alexander, hereby files its Response to defendant Brian Michael Gaherty's Sentencing Position and Objections to the Presentence Investigation Report, filed at Dockets 37 and 38 ("Response").

    This Response is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 13, 2024				Respectfully submitted,

						E. MARTIN ESTRADA
						United States Attorney

						MACK E. JENKINS
						Assistant United States Attorney
						Chief, Criminal Division


						*/s/ Laura A. Alexander*
						LAURA A. ALEXANDER
						Assistant United States Attorney

						Attorneys for Plaintiff
						UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

I.     INTRODUCTION................................................1

II.    ARGUMENT....................................................1

       A.   Defendant's Age and Health Conditions Are Not So
            Unusual That Departures Under §§ 5H1.1, 5H1.3, and
            5H1.4 Are Warranted....................................1

       B.   Defendant Is Not Entitled To A § 5K1.1 Departure
            Because He Did Not Cooperate With Law Enforcement.........3

       C.   Defendant Is Not Entitled to a § 5K2.13 Diminished
            Capacity Departure Because His Offense Involved
            Serious Threats of Violence..............................5

       D.   Defendant Is Not Entitled to § 4C1.1 Zero-Point-
            Offender Departure Because His Offense Involved
            Credible Threats of Violence.............................6

       E.   The Guidelines Do Not Overstate the Gravity of
            Defendant's Serious Offense..............................8

       F.   No § 5K2.0 Departure is Warranted.......................10

       G.   No Variance is Warranted under the § 3553(a) Factors.....11

       H.   Probation Correctly Applied a § 3A1.1 Hate-Crime
            Enhancement In Calculating Defendant's Total Offense
            Level..................................................13

III.   CONCLUSION.................................................14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Imposing the non-custodial sentence for which defendant advocates would send a message -- to defendant and others wishing to emulate his conduct -- that the cost of hurling vile, racist death threats at Congresspeople of color is insignificant, and the intentional disruption of their legislative work will result in nothing more than a slap on the wrist.  The departures defendant asks this Court to apply are either: (1) inapplicable because the Guidelines explicitly prohibit their application in cases involving serious and violent threats; or (2) unwarranted because defendant fails to meet his evidentiary burden to substantiate their application.  Similarly, and as Probation recognizes, no "factors . . . warrant a variance from the applicable guidelines range."  On balance, a low-end, Guidelines-range sentence -- 33 months' imprisonment followed by three years' supervised release -- appropriately balances defendant's mitigating circumstances with the egregious nature of his terrorizing threats.  Such a sentence is sufficient, but not greater than necessary, to serve the goals of sentencing under 18 U.S.C. § 3553(a).

**II.  ARGUMENT**

   **A.  Defendant's Age and Health Conditions Are Not So Unusual That Departures Under §§ 5H1.1, 5H1.3, and 5H1.4 Are Warranted**

Defendant, 61, argues that his age, mental condition, and physical condition warrant departures under §§ 5H1.1, 5H1.3, and 5H1.4 of the Guidelines.  According to a summary of defendant's

1

medical records drafted by defense counsel[1], defendant suffers from Post-Traumatic Stress Disorder ("PTSD"), Bipolar Disorder, and depression. Further, according to defendant's summary, defendant suffered a "lumbosacral canal compromise," or nerve damage, in 2016. Defendant thus concludes that, based on his age and these conditions, he "cannot be adequately treated in the Bureau of Prisons."

Here, defendant has failed to meet his burden to demonstrate that §§ 5H1.1, 5H1.3, and 5H1.4 departures are warranted. He presents no evidence demonstrating that the Bureau of Prisons ("BOP") cannot adequately care for his mental conditions, and it is unclear from defendant's sentencing memorandum to what extent he still needs treatment, if at all, for the "lumbosacral canal compromise," he suffered in 2016. Regardless, "[t]he [BOP's] professional staff provides essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards for a correctional environment." Medical Care, Federal Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/medical_care (last visited June 13, 2024). Further, "[t]he [BOP] uses licensed and credentialed health care providers in ambulatory care settings, that are supported by community consultants and specialists." Id. And "[f]or adults in custody with chronic or acute medical conditions, the [BOP] operates seven [] medical referral centers providing advanced care." Id.

---

[1] Defendant cites to Exhibit 7 throughout his sentencing memorandum, which is apparently 2,611 pages of medical records. He does not actually submit any pages of this Exhibit to the Court for review though. These conditions are thus unsubstantiated by any independent documentary support, but the government will assume, for purposes of argument, that defendant in fact suffers from these conditions.

In short, defendant fails to establish that his age, mental conditions, and physical condition, "individually, or in combination with other characteristics, are present <u>to an unusual degree</u> and distinguish th[is] case from the typical case covered by the Guidelines." U.S.S.G. §§ 5H1.1, 5H1.3, and 5H1.4. This Court should thus decline to award these requested departures.

**B.   Defendant Is Not Entitled To A § 5K1.1 Departure Because He Did Not Cooperate With Law Enforcement**

Defendant advocates for a § 5K1.1 departure based on his "immediate willingness to cooperate with the investigation and prosecution of [his] criminal activity." (Dkt. 38 at 3.) According to defendant, he cooperated with law enforcement by answering the questions of two FBI agents who approached him at his residence in December 2022, and by "consenting to an interview with the United States Capitol Police in April 2023." (<u>Id.</u>)

Defendant twists the procedural history of this case to back an unwarranted § 5K1.1 departure. Departures under § 5K1.1 are warranted where a defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. Defendant never provided any such assistance in this case, much less substantial assistance. Rather, defendant was warned, on multiple occasions, to disengage from sending vile, violent threats to Congresswomen of color, including Congresswoman Waters. He refused, continued to threaten these Congresswomen, expressed blatant disrespect for the Capitol Police, and lied to law enforcement when confronted with his conduct.

Here, in August 2022, defendant left two voicemails with Congresswoman Waters, threatening to "cut [her] black ass throat" and

3

relaying that he and other "boys in the area" had a "contract on [her] . . . black ass." (Dkt. 31-2 & 31-3, Exs. 2 & 3.) Defendant similarly threatened a Latina Congresswoman through a voicemail, and told her "we're gonna make you suffer a bitch." (Dkt. 31-6, Ex. 6.)

Then, in October 2022, a Capitol Police Special Agent called defendant, asked him for his name, informed him of the Capitol Police's investigation into threats originating from his phone number, and asked defendant whether he was making these threats. (Dkt. 31-1, Ex. 1.) Defendant provided a false name, denied his conduct, and hung up. (Id.) Later the same day, defendant called the Latina Congresswoman he previously threatened and stated, "[T]his is not no threat. Call the Capitol Police. I'll tell them to suck my dick too." (Dkt. 31-7, Ex. 7.)

A few weeks later, defendant left two additional threatening voicemails with Congresswoman Waters, wherein he made clear that he knew his threats were reported to the Capitol Police, and that such reports to law enforcement would not deter him. (Dkt. 31-4 & 31-5, Exs. 4 & 5). For example, on November 8, 2022, defendant stated, "You done fucked up . . . this ain't no threat man." (Dkt. 31-4, Ex. 4.)

In December 2022, two FBI Task Force Officers, working in conjunction with the Capitol Police, approached defendant at his home to discuss his persistent, violent threats to Congresswomen of color. (Dkt. 31-1, Ex. 1 at 11.) Although defendant consented to a search of his home during this interaction, he denied ever threatening any Congresswoman over and over. (Id.) After this meeting with FBI Task Force Officers, defendant again left a voicemail, in late February 2023, for the Latina Congresswoman he previously threatened: "It's

4

not a threat, but . . . my second amendment, man.  Freedom of speech. . . . Go fuck yourself, Latina bitch." (Dkt. 31-10, Ex. 10.)

Finally, in April 2023, after his arrest, defendant agreed to waive his Miranda rights and speak with Capitol Police agents. During this interview, where agents and defendant together listened to his recorded voicemail threats, defendant repeatedly denied his criminal conduct.

Any characterization of the above-detailed procedural history as "cooperation with law enforcement" is, simply put, a gross misrepresentation of the truth.  No § 5K1.1 departure is warranted.

### C. Defendant Is Not Entitled to a § 5K2.13 Diminished Capacity Departure Because His Offense Involved a Serious Threat of Violence

Defendant next advocates for a § 5K2.13 departure on the basis that his threats were the result of a "significantly reduced mental capacity." (Dkt. 38 at 9.)  Section 5K2.13 provides that a "sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity."  This section, however, forbids downward departures based on reduced mental capacity "if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public."  U.S.S.G. § 5K2.13.

Here, although defendant suffered from PTSD and other mental health issues at the time of his crimes, there is no evidence to suggest that these conditions contributed to his criminal conduct in

5

any way. Defendant's conclusory assertions do not change this fact. Even if there were such evidence, defendant would still be ineligible for a § 5K2.13 departure because his offense "involved . . . a serious threat of violence." U.S.S.G. § 5K2.13. Accordingly, this Court should decline to award a § 5K2.13 departure.

### D. Defendant Is Not Entitled to § 4C1.1 Zero-Point-Offender Departure Because His Offense Involved Credible Threats of Violence

Section 4C1.1 of the Guidelines provides for a two-level departure where a defendant "did not receive any criminal history points." Among other requirements, eligibility for this departure requires that the defendant "did not use violence or credible threats of violence in connection with the offense," and "did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim)[.]" U.S.S.G. §§ 4C1.1(3), (9).

Probation correctly declined to apply a § 4C1.1 departure to defendant's offense level calculation because defendant "made multiple credible threats of violence" in carrying out his offense. (PSR ¶¶ 39-40.) Defendant objects to Probation's rejection of a § 4C1.1 departure for two reasons. First, defendant argues that he did not use violence in connection with his offense. This is irrelevant. As defendant acknowledges, and as § 4C1.1(3) makes clear, credible threats of violence, in addition to the use of violence, independently make a defendant ineligible for this zero-point-offender departure.

Second, defendant argues that while he made threats to Congresswoman Waters, those threats were not "credible" threats of violence. (Dkt. 38 at 4.) To support this position, defendant contends that he: (1) never confronted Congresswoman Waters,

6

(2) never travelled to her location in California, (3) never researched ways to travel to California, (4) never affiliated with any gang or organization that could commit any act in furtherance of his threats, and (5) threatened Congresswoman Waters from his home in Texas.  (Dkt. 38 at 4.)

Defendant's argument holds no water.  Defendant's recorded voicemails make clear that his threats are serious expressions of intent to harm Congresswoman Waters.  He did not, for example, make some grandiose and incredible threat to send aliens to harm her.  Rather, defendant threatened to "com[e] for [Congresswoman Waters'] black ass[,]" "cut [her] black ass nigga throat[,]" fulfill a "contract on [her] . . . black ass[,]" "put a cap between [her] motherfucking eyes[,]" "stomp [her]," "meet [her] on the street [] and give [her] a present[,]" "get in [her] face[,]" "take [her] ass out[,]" and "play goddamn gang[.]"  (Dkts. 31-2 to 31-5, Exs. 2, 3, 4, & 5.)  Such terrorizing threats squarely fall within § 4C1.1's bar against extending the departure to those whose offense conduct involves "credible threats of violence."  See United States v. Stewart, 420 F.3d 1007 (9th Cir. 2005) (finding that defendant's statement that he wanted to target a federal judge and "string the motherfucker up and cut her throat" combined with an offer to provide weapons and a money reward could reasonably be interpreted as a serious expression of intent to harm or assault the target); United States v. Orozco-Santillan, 903 F.2d 1962, 1265-66 (9th Cir. 1990) (affirming the defendant's conviction under 18 U.S.C. § 115(a)(1)(B) for threatening a federal agent where the defendant stated he would "kick" the agent's "fucking ass," urged the agent to "box" with him, cursed at the agent, and pushed him).

7

Further, that defendant did not actually follow through with his threats to assault and murder Congresswoman Waters does not justify a downward departure. Indeed, the recipient of these deplorable threats, Congresswoman Waters, *did not know* that defendant would not, in fact, confront her. She *did not know* that defendant would not travel to her office or home in California, as he promised. She *did not know* that he would not, in fact, follow through with his plan to "put a cap between [her] motherfucking eyes." In fact, the Capitol Police had to immediately investigate defendant's threats to determine whether he presented an imminent safety risk to Congresswoman Waters. (Dkt. 31-3, Ex. 1 at 5.) Defendant's threats alone caused panic and terror. This is exactly why defendant's serious conduct was so disruptive to Congresswoman Waters' life and work, and exactly why a significant custodial sentence is warranted.

### E. The Guidelines Do Not Overstate the Gravity of Defendant's Serious Offense

Defendant next contends that this Court, in imposing his sentence, should depart downwards because "the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." (Dkt. 38 at 10.) In his pitch for this departure, defendant minimizes the very serious nature of his offense, and essentially asks this Court to reduce his sentence because he only *threatened* to assault and murder Congresswoman Waters, and did not actually assault and murder her. Indeed, defendant claims that "the Sentencing Guidelines [] overstate the gravity of the offense . . . because he committed no act in furtherance of carrying out his threats against anyone." (Id.) Defendant further emphasizes that he

8

did not confront Congresswoman Waters, did not travel to Congresswoman Waters' office or home, and did not travel to California.  (Id.)

First and foremost, defendant is ineligible for a § 5C1.1 departure.  Application Note 10 to § 5C1.1 provides that "[a] departure . . . may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."  As discussed above in § II.D, a § 4C1.1 departure is not warranted because defendant's offense involved credible threats of violence, e.g., threats to "com[e] for [her] black ass[,]" "cut [her] black ass nigga throat[,]" and fulfill a "contract on [her] . . . black ass[.]" (Dkt. 31-2 & 31-3, Ex. 2 & 3.)

Second, even if defendant were eligible for a § 4C1.1 zero-point-offender departure, a § 5C1.1 departure would still be inappropriate because defendant's offense of conviction is a serious one with grave impact on his victim, Congresswoman Waters, our community, and our system of governance.  Congresswoman Waters was elected to serve the people of the 43rd Congressional District, which is comprised of the communities of Westchester and Playa Del Rey, the unincorporated areas of Lennox, West Athens, West Carson, Harbor Gateway, El Camino Village, and Watts, and the cities of Gardena, Hawthorne, Inglewood, Lawndale, Lomita, and Torrance.  Defendant's violent threats terrorized Congresswoman Waters and her office.  This is exactly what defendant intended.  And threats like defendant's to Congresspeople across the country significantly impact the

9

legislative work of our Congress, and impede the ability of our Congresspeople to fulfill their legislative and constitutional duties.  The United States Capitol Police further expended resources (which could have been used elsewhere) to thoroughly review and investigate defendant's threatening voicemails.  Indeed, when Congresspeople report threats like defendant's to the Capitol Police, agents must swiftly assess the potential for targeted violence and the immediate risk to the victim.

Finally, there is no evidence that defendant suffered "paranoid delusions of persecution" when he threatened to assault and kill Congresswoman Waters in August and November 2022, and as discussed above in § II.D, defendant's threats were not "grandiose" and incredible, as he claims.  Rather, his threats were serious expressions of intent to harm Congresswoman Waters, and the fact that defendant did not actually "put a cap between [her] motherfucking eyes" does nothing to demonstrate that the Guidelines overstate the severity of defendant's offense.  Indeed, as already discussed, defendant caused the exact harm he intended, i.e., the terrorization of Congresswoman Waters and her office, and the disruption of her legislative work.  Given defendant's deplorable words and importantly, his promise that his words were "not a threat," Congresswoman Waters had no reason to believe that defendant would not carry out his stated plan to "cut [her] black ass nigga throat." (Dkts 31-2 & 31-4, Exs. 2 & 4.)

**F.   No § 5K2.0 Departure is Warranted**

Section 5K2.0 of the Guidelines provides that a departure from the Guidelines may be warranted where if "a combination of two or more offender characteristics or other circumstances, none of which

10

independently is sufficient to provide a basis for a departure . . . taken together, make the case an **exceptional** one" and "each such offender characteristic is . . . present to a substantial degree [and] a permissible ground for departure[.]"  None of the departures for which defendant advocates is warranted here.  This is the case because defendant is either ineligible for the above-discussed departures due to the nature of his offense, or defendant has not met his burden to show that the departure is warranted by the evidence.  Because none of these departures are warranted to any degree, the combination of defendant's offender characteristics similarly do not, taken together, make this case an exceptional one.  Accordingly, this Court should decline to award a § 5K2.0 departure.

### G.   No Variance is Warranted under the § 3553(a) Factors

Defendant asks this Court to grant a downwards variance after considering the 18 U.S.C. § 3553(a) factors.  The government recognizes defendant's mitigating circumstances, including his PTSD diagnosis and other medical issues.  But for these mitigating circumstances, the government would not be recommending, pursuant to defendant's plea agreement, a low-end Guidelines range sentence of 33 months' imprisonment.  To vary below 33 months to the sentence requested by defendant -- time served (which would amount to a few days, as defendant has been on bond through the entire pendency of this case) -- would send a message to defendant, and individuals considering similar behavior, that the cost of lobbing vile, racist threats at Congresspeople and other federal officials is insignificant.

Indeed, a non-custodial sentence would ignore the incredibly aggravating circumstances present in this case.  Defendant

11

represents, in his sentencing memorandum, that he would not have committed the instant offense "[h]ad he not been suffering from a crippling series of mental illnesses." (Dkt. 37 at 13.) He further claims that he "has no memory of making any of the calls" to Congresswoman Waters. (Id.) The evidence contradicts these claims.

First, defendant presents no evidence that defendant's PTSD diagnosis in any way contributed to his offense conduct. Second, defendant demonstrated **through his own words** that he remembered his calls to Congresswoman Waters and other Congresswomen of color. As described in detail in § II.B, defendant left threatening voicemails with Congresswoman Waters in August 2022, and with a Latina Congresswoman in September 2022. Then, after being warned by the Capitol Police to disengage from this behavior in October 2022, defendant called the Latina Congresswoman he previously threatened and stated, "[T]his is not no threat. Call the Capitol Police. I'll tell them to suck my dick too." (Dkt. 31-7, Ex. 7.) And a few weeks later, defendant left two additional threatening voicemails with Congresswoman Waters, wherein he made clear that reports to law enforcement would not deter him from the conduct *that he clearly remembered*. (Dkt. 31-4 & 31-5, Exs. 4 & 5.) Indeed, on November 8, 2022, defendant stated, "You done fucked up . . . this ain't no threat man." (Dkt. 31-4, Ex. 4.) This evidence demonstrates that defendant knew exactly what he did, knew his victims were reporting his conduct to law enforcement, and decided -- *after* receiving opportunities to disengage -- to repeatedly terrorize his victims with racist, violent threats. No variance is warranted.

### H. Probation Correctly Applied a § 3A1.1 Hate-Crime Enhancement In Calculating Defendant's Total Offense Level

Defendant objects to Probation's application of a three-level enhancement under § 3A1.1 in calculating defendant's total offense level. Section 3A1.1 of the Guidelines provides for a three-level enhancement where "the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim . . . as the object of the offense of conviction because of the [victim's] actual or perceived race."

To support this position, defendant cites to two references by defendant among his four voicemails that Congresswoman Waters causes "controversy." (Dkt. 37 at 7.) According to defendant, these two references demonstrate that defendant was "in the throws [sic] of a mental break down" and suffering delusions during each of the four times that he called Congresswoman Waters and threatened to assault and murder her. (Id.) Defendant then puts forth the following narrative:

> [Defendant's] state of mind at the time [of his threats] erroneously led him to believe that some comments he heard from Congresswoman Waters (either directly or through various media stories) were calls to action levied against him.  Mr. Gaherty's hypervigilance in watching news reports (a symptom of his PTSD) no doubt exposed him to Congresswoman Waters, and other high profile public figures, on a regular basis. . . . As his mental illnesses caused his mind to misperceive her statements, Mr. Gaherty made the phone calls that caused him to appear before this Court.

(Dkt. 38 at 3.)

Defendant's narrative is not supported by any evidence. Defendant suffers from PTSD and receives medical treatment for this diagnosis. The government does not contest this.  There is no evidence, however,

13

that defendant's diagnosis in any way contributed to his criminal conduct in this case, in August and November 2022. And there is certainly no evidence of four separate mental breakdowns that all conveniently took place at the times that defendant threatened to harm Congresswoman Waters. This account of events is self-serving, not rooted in fact, and contradicted by defendant's own recorded threats.

In fact, even if defendant's "hypervigilance" exposed him to a number of "high profile public figures," including Congresswoman Waters, he *only* called and threatened Congresswomen of color. To believe defendant's version of events would be to believe that he *only* "misperceived" the statements of black and Latina women. This is illogical. Defendant's threats tell a different story. As noted in the government's sentencing memorandum, defendant's four voicemails, totaling three minutes, were rife with vile, racial slurs. (Dkts. 31-2 to 31-5, Exs. 2-5.) And these slurs were not at random; defendant relentlessly threatened violence against Congresswoman Waters when using these reprehensible words. "We got something for your ass now . . . you black motherfucker." (Dkt. 31-2, Ex. 2.) "We coming for your black ass." (Id.) "I'mma cut your black ass throat nigga." (Id.) Defendant made his purpose clear. This evidence shows, beyond a reasonable doubt, that defendant intentionally selected Congresswoman Waters as the object of his offense because of her race. This Court should accordingly apply the § 3A1.1 hate-crime enhancement, as recommended by Probation.

**III. CONCLUSION**

For the foregoing reasons, the government requests that this Court decline to award: (1) departures under §§ 5H1.1 (age), 5H1.3 (mental condition), 5H1.4 (physical condition), 5K1.1 (cooperation),

5K2.13 (diminished capacity), 5C1.1 (Guidelines overstatement) and 5K2.0 (combination of factors); and (2) a variance pursuant to the § 3553(a) factors.  Further, the government requests that this Court overrule defendant's objections to the PSR and: (1) find that defendant is ineligible for a § 4C1.1 zero-point offender departure; and (2) apply the § 3A1.1 hate-crime enhancement recommended by Probation.  Finally, the government requests that this Court sentence defendant to a low-end, Guidelines-range sentence of 33 months' imprisonment, followed by three years of supervised release.

 Dated: June 13, 2024                    Respectfully submitted,

                                         E. MARTIN ESTRADA
                                         United States Attorney

                                         MACK E. JENKINS
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         */s/ Laura A. Alexander*
                                         LAURA A. ALEXANDER
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

15